# CorVel

## PROGRESS REPORT #3

| | |
|---|---|
| Claimant Name: | Pamela Estes |
| Date of Injury: | 3/01/01 |
| Referral Date: | 01/16/04 |
| Employer: | Fred Meyers |
| Adjuster: | Angela White |
| Claim No: | 200223052 |
| CorVel No: | 08002108-1 |
| Date of Report: | 5/03/04 |

Pamela Estes is a 49-year old employed by Fred Meyers as the manager of the nutrition department. According to the client during the initial interview on 1/28/04, she was required to unload and move large amounts of stock. Case manager noted from the employer claims summary, "Ms. Estes injured her back but did not complete workers' compensation paperwork for over one year. When she realized that her back would not get better on it's own, she filed the paperwork and sought treatment."

## MEDICAL HISTORY

Per review of medical records it was noted that on 6/21/01 Dr. Susan Klimow of Rehabilitation Medicine Associates evaluated the client for low back pain. Dr. Klimow stated in her visit note that the client claimed numbness in her right toes for two days. Client apparently denied history of low back pain except sciatica in the left leg, which resolved after seeing a chiropractor. Client described the pain as aching, sharp, and burning and claimed that lying down made it worse. Client rated the pain at a level 6/10. Dr. Klimow's Impression stated, "Low back strain, Poss. Discogenic pain, change in skin sensation." Celebrex 200mg QD and physical therapy were prescribed. A MRI performed on 6/22/01 MRI Lumbar spine revealed:

- Marked disc space narrowing with chronic end plate changes at L5-S1.
- Diffuse annular bulging at L5-S1 with disc material more prominently bulging into the left L5-S1 neural foramen. No mass effect on the left L5 nerve root is defined.
- Disc material projecting into the left neural foramen at L4-5. Again, no definite mass effect on the exiting left L4 nerve root is defined.
- The facets are unremarkable and there is no significant central spinal stenosis.

On 7/13/01 and 9/25/01 Dr. Levine performed a right L5 transforaminal selective as well as a caudal epidural with a 30% reduction in the client's pain after the second injection. The client was released to work on 8/08/01 for 32-40 hours per week with restrictions. On 10/09/01 the client stated that she was unable to complete physical therapy as she was working full time. Another physical therapy referral was initiated. Dr. Levine performed a left approach provocative discography at the L3-4, L4-5, and L5-S1 levels on 11/16/01. An epidural steroid injection was performed. The discography revealed:

- Abnormal provocative discography.
- Normal provocative discography, discogram, and discometrics at the L3-4 level.
- Normal provocative disography, discometrics, and discogram at the L4-5 level with the exception of very slight posterior extravasation of material, but this was minimal and seemed to track along the needle entry site.
- Significant L5-S1 degeneration with significant loss of disc space height and reproduction of her pain consistent with an L5-S1 pain generator site, but given the significant loss of disc height, I

---

CorVel Corporation
www.corvel.com

1835 South Bragaw Street
Suite 525
Anchorage, AK 99508

907.274.2785 phone
907.274.7583 fax
800.478.6824

Estes v. Wal-Mart
DEF 111562

Exhibit A
Page 1 of 5 Pages

CORVEL  
Client: Pamela Estes  
Claim No.: 200223052  
CorVel No.: 08002108-1  
Page No.: 2

do not believe she is a candidate for IDET procedures at this level. We will need to consider other options for care.

Dr. Levine performed a Medial branch block L5 right, S1 right, L5 left, S1 left on 7/12/02, which provided **significant improvement and sleeping better**. Dr. Levine wrote that client was a good candidate for radiofrequency when her pain returns as client has significant degenerative disease and may be a candidate for nucleoplasty.

On 8/16/02 Dr. Baker performed an IME and his impression was Lumbosacral strain, occurring around 3/01/01, Continued low back pain and left buttock area pains, degenerative disc disease L4-5 and L5-S1, with the latter level the more significant, and history of herpes zoster, left forehead area on 8/01.

Dr. Levine performed a **Radio Frequency medial branch block L5 S1 bilaterally on 8/20/02**. Dr. Levine stated that client could return to work 8/26/02. On a follow up visit on 9/05/02 Dr. Levine found that there was an overall improvement though client continued to experience some low back pain. On 9/24/02 x-ray lumbar spine revealed degenerative Disc disease with osteoarthritic spurring at L5-S1.

The client was again evaluated by Dr. Gevaert on 9/25/02. Dr. Gevaert reviewed x-rays of lumbar spine in flexion and extension position and noted significant L5-S1 Degenerative Disc Disease. **Client was removed from work on 10/16/02** by Dr. Gavaert due to an increase in her low back pain. Another MRI was performed on 11/13/02 and revealed Disc degeneration at multiple levels. It was most marked at L5. There was a small true lateral protrusion, probably a small herniation to the left of midline at L4-5, which does not appear to encroach upon the nerve root. At L5-S1, there was circumferential disc protrusion, but less so than was seen on the previous exam on this patient and there is not significant stenosis of the canal or compromise of nerve roots or neural foramina at any level. On 12/10/02 a CT of the Lumbar Spine and a two-level discogram was performed and revealed evidence of contrast material extravasating from both discs into the left sided neural foramen at their respective levels. However no soft tissue mass effect upon the exiting intracanalicular left L3-L4 nerve roots is defined. Note also is made of chronic degenerative changes at the L5-S1 level. These included marginal osteophytes, which projected into the nerual foramen bilaterally. These osteophytes result in mild foraminal stenosis. No significant mass effect upon the exiting intracanalicular nerve roots is defined. An IDET was performed on 1/23/03 by Dr. Gavaert at level L4-L5 left. The client continued to receive physical therapy. During a post IDET evaluation on 3/13/03 Dr. Gavaert noted a continued improvement of symptoms with no radiating pain. Pain level at 3/10. Dr. Gevaert instructed client to continue physical therapy.

During a meeting on 1/28/04, client indicated that she experienced a 50% reduction in her pain since the IDET procedure but continued to have pain in the lower back. A discography was performed on 2/05/04, medical records pending.

## CURRENT MEDICAL CONDITION

On 5/03/04 contacted client for an update of current condition. Client indicated that she was currently having her period and was unhappy because she had tried to calculate and plan so that she would not be on her period during or after surgery. Client stated that her pain was "the same but may be worse due to her period." Client stated that she had lost a total of 18 pounds. Client stated that her thyroid biopsy was benign.

CORVEL    Client:       Pamela Estes
         Claim No.:    200223052
         CorVel No.:   08002108-1
         Page No.:     3

Current medications:

During the week of 3/29/04, the client stopped all medications due to urinary frequency. The medications that she was prescribed at that time were Oxycodone and Ambien.

Treating Physician(s):

Dr. Levine
Dr. Gevaert
Dr. Eule

Scheduled Appointments/Procedures:

5/13/04 Dr. Lee, Physical examination for surgery
5/25/04 Dr. Eule, Preoperative evaluation for fusion
5/26/04 Fusion surgery scheduled

**WORK STATUS/RESTRICTIONS**

Client is not working at this time and is drawing TTD benefits. Employee has worked at Fred Meyers since 3/23/90 at $18.35 per hour. Client has had an active life style until back injury and enjoyed running the Mt. Marathon race every year.

**SUMMARY OF EFFORTS**

4/02/04 Received message from James at the Spine Institute billing returning case manager's call.

Contacted James at spine institute and was informed that he was out of the office. Requested email information.

4/05/04 Contacted client to confirm attendance at appointment with Dr. Geveart this day. Client discussed urinary frequency that she claimed she had experiencing off and on since two weeks after the discogram. Client stated that she had stopped the Wellbutrin first, thinking that was causing the urinary frequency. Client stated that she had stopped her pain medication "several weeks ago." Client talked about current condition and stressors.

Contacted physician to confirm appointment this day and to inform them that case manager will be attending appointment.

Case manager met with client prior to and after appointment with Dr. Gevaert. Case manager was not called into room at the end of appointment. Office appointments were behind and they did not have time to meet with case manager. Observed client ambulate without signs or symptoms of distress or pain. Client informed case manager upon arrival that she "had to find a potty." Purpose of this visit is for evaluation of symptoms of urinary frequency. Client stated that the "frequency comes and goes." Client claimed that she "thought that it began building up approximately two weeks after the discogram but expressed uncertainty regarding onset as it has been bad then had improved." Client stated that she

Estes v. Wal-Mart
DEF 111564

Exhibit A
Page 3 of 5 Pages

CORVEL    Client:      Pamela Estes
          Claim No.:   200223052
          CorVel No.:  08002108-1
          Page No.:    4

experienced pain in her lower back only with certain activities. Client stated that she had noted some discomfort across upper back at the lower scapular margin and rated it at a 3/10. Client attributed this discomfort to compensating for lower back as she had stopped all medication due to urinary frequency. Client claimed that position changes could elicit "urge to void." Client claimed that she thought that she could walk one mile and could sit for one hour comfortably. Client stated that she "just wanted to get the surgery over with." Met with client after her interview with Dr. Gevaert. Client stated that Dr. Gevaert did not believe the urinary frequency was due to the prior procedure or her back. Dr. Gevaert ordered a u/a. Client stated that she was going to the lab to have test performed this day. Client stated that Dr. Gevaert informed her that she could resume medications and that the fusion would not be performed if she had an infection as it could cause, infection in her spine.

4/06/04 Phone call to the adjuster to provide an update of appointment with Dr. Gevaert.

4/08/04 Contacted Dr. Eule's office and confirmed appointment this day.

Case manager met with client prior to the appointment with Dr. Eule. Client stated her pain level was 3/10 and she had pain in mid and low back. The mid back pain she characterized as a "steady ache." The low back pain was characterized as " burning, like a hot spot in my back with spasms." The client stated that she was concerned with taking any medication at this time, although Dr. Geveart wanted her to go back on the Wellbutrin and Ambien. Client stated that she was not taking any medications at this time. The client stated that she continued to have insomnia two to four times a week. Case manager suggested that she take the Ambien on the night following a night with little or no sleep to assure rest. The client expressed concern about the chance of becoming dependent so is choosing not to take the medications at this time. She has decided to go ahead with the fusion surgery on L5-S1.

Case manager and client met with the Dr. Eule while he discussed the plan for surgery. Dr. Eule informed the client that his preference was to do the fusion via an anterior approach. The client stated that she had prior C-sections and wishes the same area be used for the incision. Dr. Eule stated a low incision right above the pubic bone would be utilized and met the client's desire to use the same area as her previous incisions. Dr. Eule stated he preferred the anterior approach as there was less post operative pain because he did not have to "strip the back muscles" to access the bone to do a fusion but there was a potential drawback of using the anterior approach as the screws do not "grab the bone" as well as with the posterior approach. Dr. Eule stated that a General Surgeon, Dr. Rigley would be assisting with the procedure. The client will meet with Dr. Rigley and Dr. Eule prior to the surgery. Dr. Eule expressed his desire to apply cadaver bone to the fusion site with Bone Morphogenic Protein to assist with the fusion. The client expressed concern regarding the use of cadaver bone as she was aware that cadaver bone was "constantly being recalled." The client stated her husband works at Providence Hospital and was privy to information on cadaver bone recall. Dr. Eule discussed the possibility of using either synthetic or metal "cages" in place of cadaver bone but felt they were not the best option because of fusion problems. Dr. Eule discussed the infection rates with the three types of graft material and again stated he much preferred to use the cadaver graft material, but the final decision was the clients. The client brought up the subject of her other health concerns: urinary frequency and enlarged thyroid. The client signed a release of information so those reports could be reviewed by Drs. Eule and Rigley prior to any surgery. The client stated she had a urinalysis done two days ago and did not know the results. She scheduled her surgery for 5/10/04 but indicated she may wish to change the date depending on her menstrual cycle. She did not

| | | |
|---|---|---|
| CORVEL | Client:<br>Claim No.:<br>CorVel No.:<br>Page No.: | Pamela Estes<br>200223052<br>08002108-1<br>5 |

wish to be on her menses either during or soon after the surgery. The client will discuss with her primary physician the possibility of going on the pill to prevent a menstrual cycle for one month.

4/22/04 Contacted client to obtain an update in condition. Client indicated that her surgery is scheduled for 5/26/04 and her pre-op appointment is 5/25/04 with Dr. Eule. Client stated that she would receive a physical on 5/20/04 with Dr. Lee. Client discussed the thyroid biopsy that she underwent this day. Client stated that the physician stated that the mass was "suspicious." Client indicated that her breast biopsy was not done and that the physician had indicated that she wanted to wait for six months and recheck a mammogram. Encouraged client to contact physician's and have them forward medical records to Dr. Lee's office for her pre-op physical. Client agreed.

5/03/04 Contacted client for an update on her current condition. (Please see current condition section for more information.)

**RECOMMENDATIONS**

- Attend the combined pre-op appointment with Drs. Rigley and Eule on 5/25/04. Address expected hospital course and postoperative pain, treatment, and therapies. Assure that client's questions are addressed.

- Maintain contact with the client, her medical providers, and the adjuster as indicated to ensure all information is relayed in a timely fashion and ensure progression continues towards medical stability. File direction will be coordinated with the claims adjuster in order to assist with the expediting of claims resolution and cost containment in a timely manner.

Respectfully submitted,

*Beverly Miles RN, JM*

Beverly Miles, RN
Medical Care Coordinator