UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

PAMELA R. ESTES
    Plaintiff,

vs.

WAL-MART STORES, INC,
    Defendant.
_____

Case No. 3:06-CV-00082-TMB

COPY

VIDEOTAPED DEPOSITION OF PAMELA R. ESTES,

Pages 1-54, inclusive

Commencing at 10:12 a.m.

Wednesday, October 4, 2006

Anchorage, Alaska

Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage, AK 99501-3520
Serving Alaska Since 1953

Rick D. McWilliams, RPR, Ret.    Telephone 907.276.1680
Fred M. Getty, RPR, Ret.        Email AkSteno@aol.com
                                Fax 907.276-8016

Page 1

Page 22

1  Q. When was the next time that either you
2  contacted Wal-Mart or Wal-Mart contacted you regarding
3  this accident?
4  A. It wasn't until a few days after. It might
5  have -- probably four or five days maybe. It was about
6  the third day I was hurting pretty bad. And I had to go
7  to physical therapy, and they couldn't do anything. And
8  so it was the physical therapist that found out that, you
9  know -- or called -- actually called my doctor and said I
10 needed to be seen right away.
11  Q. And so that's when you contacted Wal-Mart?
12  A. And I went -- I went into Dr. -- actually,
13 Dr. Riley wasn't there. And they got me in to see Lee so
14 I could get an x-ray. And my husband, I think, stopped
15 by Wal-Mart after work.
16  Q. Okay. And what information did he get from
17 Wal-Mart at that point?
18  A. I don't recall.
19  Q. When was the next contact with Wal-Mart, either
20 initiated by you or initiated by Wal-Mart?
21  A. I think Wal-Mart contacted me. I'm not sure.
22  Q. Do you know how long Fred Meyer keeps --
23  A. I think when my husband stopped by there, I
24 think they wanted me to write down what happened.
25  Q. Okay.

Page 23

1  A. And I think I wrote it down and he took it in
2  to the lady that gave me her name and phone number.
3  Q. Okay.
4  A. And then I think Wal-Mart contacted me.
5  Q. Do you know how long Fred Meyer keeps their
6  videotapes -- security videotapes?
7  A. I don't have a clue.
8  Q. What does Wal-Mart, or excuse me -- what does
9  Fred Meyer do to keep, like aisles and registers clear of
10 things on the floor, such as this hanger? Do they have a
11 policy or procedure?
12  A. We preach to all employees.
13  Q. Do you know if Wal-Mart does this same thing?
14  A. I don't know what their --
15  Q. Do you have an opinion as to what Wal-Mart
16 could have done to have prevented this accident?
17  A. Pick it up.
18  Q. Do you know if anyone at Wal-Mart knew it was
19 there?
20  A. Well, if they knew, they should have picked it
21 up. With people in charge right there at the registers I
22 would think that they would have picked it up.
23  Q. And why do you say that?
24  A. I mean, just from what I think a person in
25 charge is there for. I don't know.

Page 24

1  Q. A person in charge by the registers, they're
2  watching a lot of things, correct?
3  A. Probably.
4  Q. Would it be easy or hard for them to see this
5  hanger on the floor?
6  A. I don't know. If you're not looking for it
7  you're not going to see it. If your job is to look for
8  it then you would.
9  Q. I have a note -- when was your last physical
10 therapy appointment prior to the accident? Would it have
11 been just like a day before? A few days before --
12 obviously, not the day before, that was Thanksgiving.
13  A. I don't know. I went three times a week --
14 maybe Wednesday. I don't know. You'd have to -- I'd
15 have to look in the records, or somebody would have to
16 look in the records. I don't know.
17  Q. My records reflect that you had -- you were
18 told to take a week off of physical therapy because of
19 this accident. Is that consistent with your memory?
20  A. I know I was told not to do physical therapy.
21  Q. Do you recall for how long?
22  A. No.
23  Q. How long were you actually off physical
24 therapy?
25  A. It was longer than a week.

Page 25

1  Q. And was that at the doctor's direction or were
2  there other factors, such as the holidays, or anything
3  else that played a role in that?
4  A. I don't know. I think I was probably told to
5  go by on how I was doing.
6  Q. And you said at the time of the accident your
7  right side went numb -- or can you describe what you felt
8  as far as the injury?
9  A. It's been so long. I don't want to say for
10 sure because I can't -- I can't remember everything about
11 it, other than I remember going numb.
12  Q. Okay. And how did the injury, or the pain, or
13 the problem change? I mean, it was numb, you stopped --
14  A. I was --
15  Q. -- stopped feeling as numb. You didn't think
16 you were hurt, but then, you know, what happened after
17 that?
18  A. Then it got sore, got painful.
19  Q. And that was also on the right side?
20  A. Yes.
21  Q. Was it down into the leg, or just in the hip,
22 or up the back? Can you describe where?
23  A. It was in my hip area, but I believe that the
24 soreness stemmed in an area in the middle of my back --
25 lower back.

Page 30

1   A.  A lot. A lot. We did -- we broke 22 boards of
2   freight a week.
3   Q.  As a manager you were unloading freight?
4   A.  Yes. Managers aren't what they used to be. It
5   used to be 30 percent labor, 70 percent training and
6   managing. It's not that way.
7   Q.  Were you paid on an hourly or a salary basis?
8   A.  It was hourly based on our salary.
9   Q.  Okay. Actually, on that subject, why don't I
10  have marked as Exhibit 2 this letter from Fred Meyer
11  dated January 13th 2005.
12      (Exhibit 2 marked.)
13      THE WITNESS: I'm familiar with this.
14  BY MR. EARNHART:
15  Q.  I take it you received this letter sometime
16  around January 13th?
17  A.  Uh-huh.
18  Q.  Did you discuss the letter at all with
19  Mr. Vinson as is described in the letter? Did you call
20  him and ask him about your job or anything like that?
21  A.  I'd have to go back and look because I don't
22  know if Mike was still there at that time. He's since
23  passed away.
24  Q.  Do you recall talking with anyone at Fred Meyer
25  about this letter?

Page 31

1   A.  Yes.
2   Q.  Why am I terminated? What can I do, blah,
3   blah, blah?
4   A.  Yes, I knew why I was terminated. They're only
5   required to hold your position for so long, and they way
6   surpassed that for me. And if I could have got back to
7   work, you know, even shortly thereafter, my time on the
8   job and everything would have been negotiable back.
9   Q.  Who did you discuss this with?
10  A.  Angela and --
11  Q.  Do you recall Angela's last name or what
12  department she's in?
13  A.  Angela White.
14  Q.  Anyone else you discussed it with?
15  A.  I don't know if it was after this date or
16  before. I can't recall.
17  Q.  Did you discuss it with anyone else other than
18  Angela -- discuss the whole issue of ending your
19  employment and what you could do to be re-employed?
20  A.  Yes, I called the main office in Portland,
21  Oregon.
22  Q.  And who did you talk with there, if you recall?
23  A.  I don't recall.
24  Q.  What did the main office tell you about the end
25  of your employment?

Page 32

1   A.  I talked with three or four people there with
2   public relations and payroll and -- it was three
3   different people I was connected to.
4   Q.  And what did they tell you?
5   A.  That my job was termed, and that's all there
6   was to it. It wasn't because of my employment. It was
7   because they had to fill my position.
8   Q.  Did a doctor ever release you to go back to
9   work at Fred Meyer?
10  A.  I was only released as medical stationary. And
11  I could return to work with modifications.
12  Q.  Did you ever discuss with Fred Meyer returning
13  to work with modifications?
14  A.  Yeah, they can't modify my management position
15  there unless I go back light duty. And I passed my time
16  for light duty when I termed. If I would have got --
17      VIDEOGRAPHER: You're hitting the microphone.
18      THE WITNESS: If I would have got back to work
19  prior to -- just prior to this, even if it was passing
20  out fliers at the door, I wouldn't have been termed. I
21  wouldn't have lost my insurance.
22  BY MR. EARNHART:
23  Q.  Had you known that prior to your termination
24  that you needed to be back by a certain date?
25  A.  Yes. And that's why I was excited when I was

Page 33

1   starting to get more aggressive in physical therapy --
2   prior to the injury at Wal-Mart.
3   Q.  In early January, did you discuss at all with
4   Fred Meyers or any --
5   A.  No, I wasn't even able at that time. I was
6   still recovering from the hip.
7   Q.  If you could let me finish my question.
8   A.  I'm sorry.
9   Q.  It makes it easier on the court reporter and
10  also helps us get a clear record.
11      So in early January 2005, you didn't discuss
12  with the Fred Meyers store, is there something I can do?
13  Can I sit in a chair and hand out fliers, or anything
14  like that?
15  A.  No, I did not at that time because I couldn't.
16  Q.  You were physically incapable of doing any work
17  in early January 2005?
18  A.  Yes. I injured my hip at the end of November,
19  and it laid me up for almost five months, or at five
20  months, or somewhere around five months.
21  Q.  What is your understanding as to what the
22  injury to your hip is or was? In laymen's terms, what's
23  your understanding of medically what --
24  A.  That I sprained my hip or SI joint. And I
25  think that there was, you know, some pinched nerves in

Page 42

1  than to fix your colon after the back surgery? Is that a
2  no for the record?
3      MR. JOSEPHSON: You have to answer verbally.
4      THE WITNESS: Right. I'm still thinking. I'm
5  sorry.
6      MR. JOSEPHSON: Will you repeat the question?
7  BY MR. EARNHART:
8    Q. Between the back fusion, which I think is
9  May '04; does that sound correct? Is that a yes?
10   A. Yes. I'm sorry.
11   Q. And the slip and fall at Wal-Mart,
12 November '04, in between, it sounds like shortly after
13 the back fusion you had a colon operation to fix what
14 they had screwed up during the surgery?
15   A. Well, they call it a herniated partial block.
16   Q. Any other surgeries in that time period?
17   A. No.
18   Q. Any other injuries in that time period?
19   A. No.
20   Q. I think in your recorded statement with
21 Wal-Mart you indicated that the slip and fall had been a
22 three-month setback for you. And today you've indicated
23 it was a five-month set back.
24   A. No, I think what was indicated before is that
25 Dr. Illig estimated it about three months. It was

Page 43

1  actually about five.
2    Q. Do you recall in August of 2005, being
3  evaluated for workers' compensation and being released to
4  medium duty work?
5    A. Yes. And then you'll find a letter that
6  Dr. Illig wrote because it was misstated in the first
7  one, so he wrote another one.
8    Q. So there's a second work evaluation or just a
9  letter from Dr. Illig?
10   A. A second letter based on -- second letter
11 written because of the first one.
12   Q. Now, did Dr. Illig, did he write this letter
13 because you brought the first one in to him?
14   A. I don't know if I brought it in to him, but
15 what he told me and what was on paper was two different
16 things, and so I brought it to his attention.
17   Q. Do you recall what the particular issue was
18 that was wrong in the first evaluation?
19   A. Yeah, he's telling me that I can no longer do
20 the job that I was doing with all the lifting, repetitive
21 lifting. But the letter didn't reflect that. And I know
22 personally, I could not go back and lift continually 50
23 pounds plus, so a second letter was submitted to
24 workmans' comp because that was misread or miswritten.
25   Q. I think there's a note I saw that you're

Page 44

1  raising your two grand kids?
2    A. No. We do have one granddaughter. We have one
3  granddaughter that we're taking care of. She's 11.
4    Q. So you're not raising -- okay. You are taking
5  care of your 11-year-old granddaughter?
6    A. Uh-huh.
7    Q. It also describes that you have a very busy
8  life. What is your typical day or week?
9    A. I'm not sure where you're getting that from.
10   Q. There's a note from a doctor that says you have
11 a -- you're raising two grand kids and have a very busy
12 life. So my question is, typically on --
13   A. I wish I was busy.
14   Q. What do you do on a typical day or week?
15   A. My home study course, household stuff.
16   Q. When you say household stuff what does that --
17 just cleaning the house?
18   A. Uh-huh.
19   Q. And shopping?
20   A. Actually, my husband does the shopping.
21   Q. Why is that?
22   A. He just does. He's a chef and he does the
23 shopping.
24   Q. Recreational activities, do you do any?
25   A. Actually, I don't. I didn't even go camping or

Page 45

1  fishing this year.
2    Q. When was the last time you got a fishing
3  license?
4    A. A couple of years ago.
5    Q. 2004 maybe?
6    A. I don't know.
7    Q. And did you used to --
8    A. I'd usually get them for a gift from my sons or
9  like Father's Day and Mother's Day they would get them
10 for us.
11   Q. Did you fish regularly?
12   A. I used to. I used to hunt, and fish, and camp
13 and run Mount Marathon.
14   Q. When was the last time you got a hunting
15 license?
16   A. I can't remember.
17   Q. Two years ago, or five years ago, or 10 years
18 ago?
19   A. Five years ago. I don't know -- three or four
20 years ago. Five years ago, I guess.
21   Q. And what type of hunting did you do?
22   A. Caribou.
23   Q. Anything else?
24   A. No.
25   Q. Where would you go to go caribou hunting?